OPINION
{¶ 1} Appellants, Marla Parkway, Ltd. ("Marla Parkway"), and Chardon Park, Inc. ("Chardon Park"), appeal from a judgment entry of the Geauga County Court of Common Pleas, denying their claim and awarding damages to appellee, Great Lakes Crushing, Ltd. ("Great Lakes"), on its counterclaim. For the reasons set forth below, we affirm the judgment of the trial court.
 {¶ 2} Appellants were, respectively, the owner and developer of a commercial subdivision in Chardon, Ohio. The subdivision land was approximately a 15.5 acre parcel with a twenty foot slope. John DiFini ("Mr. DiFini") owned the property and transferred it to Marla Parkway for development. Mr. DiFini formed Chardon Park to serve as the general contractor for the project. Marla Parkway retained Chagrin Valley Engineering to prepare a development plan consisting of eight to ten commercial sites accessed by a dedicated street running west from State Route 44, sometimes referred to as the Fifth Avenue Extension, in the city of Chardon, Ohio. Chagrin Valley Engineering's December 1999 plans were approved by the city in early 2000.
 {¶ 3} Great Lakes was an excavating company which contracted with Chardon Park to make site improvements within the subdivision. Mark M. Belich ("Mr. Belich"), owner of Great Lakes, wanted to bid on the excavation portion of the development project, and he reviewed the improvement plans with Mr. DiFini. In a letter from Great Lakes to Chardon Park, dated May 15, 2000, Great Lakes provided a bid quotation for work to be done on the development scheme.
 {¶ 4} The letter stated, "[l]abor only for Chardon Park, Inc. Development, a Roadway Right-of-Way Improvement, to include the following: Sanitary sewer complete[,] Storm sewer complete[,] Excavation and embankment[,] Top soil redistribution[,] Grading for hydro-seeding[,] Right-of-way and retention basin area only[,] Demolition of house and van[,] Erosion control[,] Underdrain installation[,] 304 [limestone] and fabric installed only[,] +/- 1/10 of a foot." The bid quotation noted that the following were excluded: bond fees, inspection fees, material purchases, back charges for material over runs, night work, hydro-seeding or seeding, rock excavation, fine grading for curbs or asphalt, gas, phone, electric cable trenching, right-of-way construction and retention basin, and out lot development. The bid quoted a lump sum price of $162,000, and payment was to be on the percentage complete every thirty days.
 {¶ 5} According to the quotation, "[s]igning of this quotation acts as acceptance to the above pricing and terms." The quotation was signed by Mr. DiFini, on behalf of Chardon Park, and by Mr. Belich, on behalf of Great Lakes. As such, this quotation became the contract upon which the instant action and subsequent appeal are based. The contract was less than two pages in length and is exceptionally brief and lacking in detail for a project of this magnitude. It was never supplemented in writing.
 {¶ 6} According to Mr. DiFini, the contract meant that Great Lakes would finish the storm sewers, sanitary system, water lines, and all grading, enabling the project to be ready for "proof roll." Mr. DiFini testified that "* * * proof roll is that all the ground must be zero tolerance throughout the whole road area, to be completely compacted and approved by the city, so that they will go to the next phase to put the stone down and do the curb." After that, the gutter and asphalt is put down and the road is completed. Mr. DiFini testified that "all nine yards," including asphalt paving, were to be completed by the end of 2000. Mr. Belich's testimony did not challenge this.
 {¶ 7} Appellants allege in their appellate brief that "[a]ll work was to be done according to Chardon city code and subject to final approval by the city." This requirement was stated on the improvement plans, upon which the contract was based. Those plans were reviewed by Mr. Belich in the presence of Mr. DiFini. Further, both Mr. Belich and Mr. DiFini testified that all construction and materials had to comply with Chardon city code. However, this requirement was not separately contained within or referenced by the contract. Mr. DiFini admitted that he was not familiar with the city code.
 {¶ 8} Chardon Park hired Pat Salango ("Mr. Salango"), a registered surveyor with thirty-five years of experience, to survey the property and lay out and stake the improvements. According to Mr. Salango's testimony, he staked the center line of the right-of-way first and then located sewer crossovers, catch basins, and manholes.
 {¶ 9} Great Lakes began work on the site on June 23, 2000, working until August 2000. Great Lakes had many no shows beginning August 18, 2000, and only returned to the project for a few days in October 2000, last working on October 19, 2000.
 {¶ 10} Mr. Salango testified that after he initially staked the project, he was called back to do additional staking. According to Mr. Salango, this is common because "* * * earthmovers really play havoc to these stakes that you put in the centerline of the road. They either knock them out, cover them up, dig them up, so forth * * *." Mr. Salango testified that the only reason the center line of the road was re-staked was because Great Lakes removed or knocked out the stakes. He also stated that neither Great Lakes nor any of its employees ever contacted him to question the accuracy of his staking.
 {¶ 11} Mr. Salango became aware that the elevation of a catch basin and storm sewer was not correct. Mr. Salango testified that when he originally staked the project, he staked the inlet on the side of the road which would lead into the catch basin for a storm sewer. He was not able to stake the outlet from the catch basin to the pipe because, on that day, Great Lakes was moving a lot of dirt in the area to which the catch basin emptied. Thus, Mr. Salango was not able to stake the exact sewer location. When he returned the next day, despite the lack of a stake indicating the elevation of the outlet, the basin had already been completed. Great Lakes did not admit any evidence challenging this.
 {¶ 12} Quality Control Inspection, Inc. ("QCI") was the designated agent for monitoring and documenting the progress of the improvements in the city. A QCI inspector was required to be on site when right-of-way improvements were made. The inspector had a duty to document his observations in daily work reports and submit them to the Public Service Department.
 {¶ 13} On August 10, 2000, an inspector noted an improperly installed catch basin and errors in the original drawings. As a result, Mr. Belich had expressed some concern about the accuracy of the staking to Mr. DiFini. Chardon Park agreed with Great Lakes to hire Aztech Engineering and Surveying ("Aztech") to confirm the accuracy of the staking. In November 2000, Aztech provided the services of Ralph W. Gromley ("Mr. Gromley"), a registered surveyor. Mr. Gromley testified that he found the stakes and the grades in existence to be installed according to the prints. According to Mr. Gromley, some occasional stakes were missing, but he testified that "* * * as anyone would know in the contracting business that as work goes along equipment can bump a stake or hit a stake or a stone gets pushed up against it and it gets pushed out. * * * Let's say if we put in a hundred stakes, I would say 80 to 85 percent of the stakes stay for every time that you stake." Mr. Gromley also became aware of the catch basin and storm sewer that had been installed at the wrong elevation.
 {¶ 14} On October 20, 2000, Mr. Belich faxed Larry Vagner ("Mr. Vagner"), Vice President of Chardon Park, to indicate that Great Lakes would be on the site that day, even though Great Lakes had not received payment for previous work. The parties do not dispute that Great Lakes did not appear. Chardon Park then faxed Great Lakes a memo, dated October 31, 2000, stating that the site had been re-staked and re-graded, and requesting that Great Lakes return to the project. The fax indicated that, if Great Lakes did not appear by November 3, 2000, the contract would be "null and void."
 {¶ 15} On November 1, 2000, Mr. Belich faxed Chardon Park to indicate that Great Lakes would be on the job site on November 2, 2000. Mr. Belich also indicated that his company was still expecting payment for the balance of work that had been completed and requested a written response stating whether they should be on the site or whether the contract was null and void. On November 1, 2000, Mr. DiFini replied, stating that the grade stakes had been in place for three days and no one from Great Lakes had yet appeared on the site. The letter indicated that if Great Lakes returned to the site and remained until the project was finished, Great Lakes would be paid. Great Lakes did not return to the site until April 25, 2001, after additional conversations and negotiations were had regarding payment.
 {¶ 16} Various changes had been made to the improvement plans throughout the course of construction, but only after Great Lakes initially pulled off the site.
 {¶ 17} Mr. Gromley, the second surveyor, was called back to the project in the spring of 2001 to verify the accuracy of the staking after the winter frost. On April 25, 2001, Great Lakes returned to the project. Great Lakes worked consistently until approximately June 4, 2001, with the exception of two no shows. When Great Lakes permanently pulled off the site on approximately June 4, 2001, it had never installed the additional catch basin requested by the city or modified the catch basin the city requested be moved.
 {¶ 18} QCI inspectors also made daily reports during this time, documenting various deficiencies. Among these notations were that Mr. DiFini furnished the wrong kind of pipe because he did not correctly read or understand the improvement plans or understand the city code. In May 2001, when Great Lakes was installing pipe, an inspector noted that acquisition of material by Mr. DiFini, which was required for Great Lakes to perform its obligations, was a problem.
 {¶ 19} At the end of May 2001, an inspector created a five-page list of the project's deficiencies. Chardon Park hired additional subcontractors to complete the deficiencies which appellants allege were performed by Great Lakes. Chardon Park hired WeKanDoit Enterprises, Inc. ("WeKanDoit") and Haueter Construction Company ("Haueter Construction") to get the project ready for inspection. WeKanDoit worked on the site from June 14, 2001 through July 20, 2001, and Chardon Park received a bill for these services and supplies in an amount of $25,590.70. Likewise, Haueter Construction worked on the site from September 27, 2001 through October 18, 2001, and Chardon Park received a bill for those services and supplies in an amount of $25,157.
 {¶ 20} Concrete Cutting Breaking, Inc. ("Concrete Cutting") was hired to cut out some of the catch basins which were not installed correctly, and this work totaled $1,100. Chardon Park purchased materials, in the amount of $2,303.93, from Lindsay Concrete Products Company, Inc. ("Lindsay Concrete"), to re-install the catch basins, as requested by the city. Further, Aztech billed Chardon Park in the amount of $10,490, for resurveying the site during the spring of 2001. Bills and cancelled checks were admitted delineating the payments made by Chardon Park to WeKanDoit, Haueter Construction, Concrete Cutting, and Lindsay Concrete for their services.
 {¶ 21} Chardon Park also hired DiFini Bros. Building Company ("DiFini Bros."), also owned by Mr. DiFini, to help regrade the detention basis, re-install a concrete gutter, and adjust catch basins and manholes, for a total of $9,600. Appellants also admitted a proposal by DiFini Bros. to excavate and construct an embankment, re-distribute top-soil, grade to accommodate hydroseeding, and control erosion, for an amount of $15,000. The proposal was accepted by Mr. Vagner on December 12, 2001. Cancelled checks were not offered to demonstrate that Chardon Park actually paid DiFini Bros. for these services.
 {¶ 22} While the replacement subcontractors worked on the site, the QCI inspectors continued to make daily reports. These reports again demonstrated various deficiencies. Some of these problems stemmed from Mr. DiFini's acquisition of the wrong material as well as his failure to supply the workers with plans from which to work.
 {¶ 23} Great Lakes filed a mechanic's lien against the property on August 9, 2001, for an amount of $72,026.09. Great Lakes attributed part of the balance to work performed under the contract which had not been paid, and other amounts related to additional services and labor provided by Great Lakes, upon the request of Chardon Park, which were not contained in the contract.
 {¶ 24} The record indicates that Great Lakes billed Chardon Park for $75,000 on July 10, 2000. On August 8, 2000, Chardon Park paid Great Lakes $50,000. On September 5, 2000, Chardon Park issued a check to Great Lakes, in the amount of $29,500. On October 16, 2000, Great Lakes billed Chardon Park for $55,739.40; Great Lakes also submitted work papers indicating the work that was included as part of the invoice. It was at this time that Mr. Belich and Mr. DiFini began the dialogue about payment and Great Lakes returning to the site. Thereafter, on November 7, 2000, Great Lakes billed Chardon Park for $80,751.11. This included a balance forward of $55,739.40 and new work in the amount of $25,011.71.
 {¶ 25} Great Lakes was not paid and did not return to the site until the following spring. On May 17, 2001, Great Lakes billed Chardon Park an additional $608, but it was never paid. Accordingly, Great Lakes filed the mechanic's lien against the property owned by Marla Parkway, in an amount of $72,026.09. Although $72,026.09 was detailed on the mechanic's lien, the amount allegedly due to Great Lakes under the aforementioned invoices totals $81,359.11.[1]
 {¶ 26} Although a lien had been filed against the property, Mr. Vagner lined up prospective leases. On December 17, 2001, Chardon Park entered into a lease agreement with Lake Hospital Systems ("Lake Hospital"), wherein Chardon Park agreed to lease Lake Hospital the premises having the street address of 510 Fifth Street, Suite 1, in Chardon, Ohio, for a period of ten years commencing on the first month after substantial completion of the premises.[2] Over the course of ten years, Chardon Park would have generated income from this lease in an amount of approximately $2.3 million.
 {¶ 27} Despite this lease, the road had to be inspected and accepted by the city before an occupancy permit would be issued. Chardon inspected the site and issued a report, dated October 31, 2002, admitted as Plaintiffs' Exhibit 32, indicating numerous deficiencies. Chardon Park admitted, as Plaintiffs' Exhibit 33, a list of deficiencies which it attributed to Great Lakes. In Plaintiffs' Exhibit 33, DiFini Bros. estimated that it would cost Chardon Park $25,255 to repair the deficiencies allegedly caused by Great Lakes.
 {¶ 28} Appellants commenced this action seeking damages for breach of contract and slander of title on September 19, 2001. Great Lakes filed its answer, counterclaim, and third-party complaint on October 22, 2001. Great Lakes alleged that appellants breached the contract by failing and refusing to pay Great Lakes all sums due under the contract and/or for reasonable value of all labor and materials furnished. Great Lakes also joined all lien holders who had an interest in the property and sought foreclosure of its mechanic's lien. Appellants answered the counterclaim, raising as an affirmative defense that Great Lakes' failure to complete its contract barred Great Lakes' recovery.
 {¶ 29} A two-day bench trial commenced on April 7, 2003. On June 4, 2003, the court entered its decision, finding in favor of Great Lakes on appellants' complaint and on Great Lakes' counterclaim. The court directed Great Lakes to submit a judgment entry.
 {¶ 30} On June 10, 2003, appellants filed a Civ. R. 52 request for findings of fact and conclusions of law. The trial court never specifically responded to this request.
 {¶ 31} Great Lakes submitted a proposed judgment entry on June 20, 2003. Appellants did not object to the proposed judgment entry, which contained no factual findings. The trial court issued its final judgment entry and foreclosure decree on July 8, 2003, finding in favor of Great Lakes on its counterclaim and against appellants on their complaint. Accordingly, the trial court held Chardon Park and Marla Parkway jointly and severally liable to Great Lakes in the amount of $72,026.09 plus ten percent interest per annum from June 5, 2001, plus costs. Further, the court stated that Great Lakes duly filed a mechanic's lien against the premises. The court indicated that the lien was valid, and garnishment proceedings commenced.
 {¶ 32} Appellants appealed on July 29, 2003, asserting as one of their assignments of error that the trial court failed to rule on their request for findings of fact and conclusions of law. This court, sua sponte, remanded the matter to the trial court with instructions to rule upon appellants' motion. On December 11, 2003, the trial court directed Great Lakes to prepare proposed findings of fact and conclusions of law. Great Lakes did so, and the court adopted Great Lakes' proposed findings and conclusions of law, verbatim, as its own.
 {¶ 33} Appellants were granted leave and filed an amended appellate brief, in which they put forth the following assignments of error:
 {¶ 34} "[1.] The trial court abdicated its duty under Civil Rule 52 depriving appellants of meaningful appellate review.
 {¶ 35} "[2.] The judgment of the trial court is contrary to the manifest weight of the evidence and/or based upon flawed application of the law."
 {¶ 36} In appellants' first assignment of error, they argue that the trial court abdicated its duty under Civ. R. 52 and deprived them of meaningful appellate review. Specifically, appellants contend that the trial court erred by adopting, verbatim, a biased and inaccurate statement of facts prepared by Great Lakes. Our analysis reveals that the trial court did not err, per se, by adopting Great Lakes' proposed findings of fact and conclusions of law verbatim.
 {¶ 37} In Yobe Electric v. Jarvis, Downing Emch, Inc., 7th Dist. No. 83-J-1, 1984 Ohio App. LEXIS 9300, at 4-5, the court stated, "[t]he first assignment of error complains that defendant was denied due process. The brief points out that the court's findings of fact and conclusions of law and appellee's proposed findings and conclusions are `identical, line by line, word for word, and citation by citation.' This statement is correct. There is a material difference, the latter findings are signed by the judge. They are officially his. Seemingly, the appellant argues that even if a judge finds proposed findings to be correct, he must not adopt them verbatim but somehow must convert them. We do not agree. Civil Rule 52 simply requires the judge to make findings. When he files findings of fact and conclusions of law bearing his signature, he has complied with the rule."
 {¶ 38} Likewise, "the trial court's adoption of the appellee's findings of fact and conclusions of law is not in error unless the appellant can show that the facts or law taken up were erroneous." NewHaven Corner Carry Out, Inc. v. Clay Distrib. Co., 3d Dist. No. 13-01-30, 2002-Ohio-2726, at ¶ 26. See, also, Clark v. Smith (1998),130 Ohio App.3d 648, 659. See, also, Adkins v. Adkins (1988),43 Ohio App.3d 95, paragraph three of the syllabus.
 {¶ 39} As such, it was not per se error for the trial court to adopt, verbatim, Great Lakes' proposed findings of fact and conclusions of law. Error can only be found when the findings of fact and/or conclusions of law adopted by the trial court are against the manifest weight of the evidence. Appellants' first assignment of error is without merit.
 {¶ 40} In appellants' second assignment of error, appellants contend that the trial court's judgment is contrary to the manifest weight of the evidence and/or based upon a flawed application of the law. Specifically, appellants argue that the following findings and/or conclusions are not supported by the record or the law: (1) Great Lakes completed its contract in a timely fashion; (2) the poor quality of survey work prevented Great Lakes from completing its contract in a timely fashion; (3) Chardon Park's damage evidence were cursory, summary allegations; (4) Marla Parkway cannot recover delay damages; (5) Great Lakes' affidavit of mechanic's lien was truthful and accurate; and (6) there was no basis in law or fact to support any award of damages to Great Lakes. This assignment of error is without merit.
 {¶ 41} Our inquiry necessarily must be one of mixed questions of law and fact. Ordinarily, a judgment will not be reversed as against the manifest weight of the evidence if it is supported by competent, credible evidence that goes to all essential elements of the case. C.E. MorrisCo. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279. Where a contract is clear and unambiguous, its interpretation is a matter of law. NationwideMut. Fire Ins. Co. v. Guman Bros. Farm, 73 Ohio St.3d 107, 108,1995-Ohio-214; Ohio Historical Soc. v. Gen. Maintenance and Eng. Co.
(1989), 65 Ohio App.3d 139, 146.
 {¶ 42} But where a contract is ambiguous, the meaning of the words in the contract becomes a question of fact, and the trial court's interpretation will not be overturned on appeal absent an abuse of discretion. Ohio Historical Soc. at 146-147; United States Fid. andGuar. Co. v. St. Elizabeth Med. Ctr. (1998), 129 Ohio App.3d 45, 55. The trial court is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co.v. Cleveland (1984), 10 Ohio St.3d 77, 80. Accordingly, when a contract is ambiguous, we must indulge every reasonable presumption in favor of the trial court's judgment and its underlying findings of fact. Id. at 80. If the evidence is susceptible to more than one interpretation, we must give deference to the trial court's credibility determinations. Id.
 {¶ 43} As an initial matter, we note that because the challenged findings are findings of fact, they will not be disturbed absent an abuse of discretion. See, e.g., Ohio Historical Soc. at 146-147. We must indulge every reasonable presumption in favor of the trial court's judgment and its underlying findings of fact. Seasons Coal at 80.
 {¶ 44} Within this second assignment of error, appellants challenge the trial court's findings of fact that Great Lakes completed its contract in a timely fashion and that the poor quality of the survey work prevented Great Lakes from completing the project in a timely manner. This argument is without merit.
 {¶ 45} The contract in the instant matter is severely lacking in detail. The contract was based upon a bid, submitted by Great Lakes, to Chardon Park, later signed by both parties. It was never supplemented in writing. The contract does not specify in any way that either party was required to complete its obligations within a certain time frame or by a certain date.
 {¶ 46} Nevertheless, when a date of performance is not specified, a reasonable time under the circumstances is implied. See, e.g., Lancasterv. Rahlfs (June 2, 1994), 8th Dist. No. 66146,1994 Ohio App. LEXIS 2377, at 6-7; Miller v. Bealer (1992), 80 Ohio App.3d 180, 182. This contract could not be executed by one party independently of the other. The parties had to work together. Staking was appellants' responsibility, and staking was a necessary prerequisite to Great Lakes' ability to fulfill its obligations under the contract. Mr. Salango, appellants' initial surveyor, admitted that he had to stake the area twice. Appellants even hired a second company, Aztech, to verify the accuracy of the staking. Aztech staked the area in the fall of 2000 and again during the following spring. During the time Great Lakes worked on the project, QCI reports continually indicated problems with the accuracy of staking, especially about the time Great Lakes initially pulled off the site.
 {¶ 47} The record also demonstrates that Great Lakes did not always receive timely payments for the work that was completed.
 {¶ 48} In summary, the evidence supported a conclusion that appellants were, at times, significantly deficient in performing their own obligations, thereby precluding Great Lakes from timely completing its obligations. Competent, credible evidence supported the trial court's finding that the poor quality of the survey work prevented Great Lakes from completing its contract in a timely fashion. However, considering the unique cooperative nature of this undertaking, the trial court's finding that Great Lakes actually did complete its contract in a timely fashion is also supported by competent, credible evidence. Mr. Vagner testified that the "harsh" weather conditions prevented Great Lakes from working on the project during the winter of 2000. The project could not continue until it was re-staked in the spring of 2001, after the winter frost ended. As such, these factual findings were not against the manifest weight of the evidence.
 {¶ 49} We now turn to appellants' contention that the trial court erred by finding Chardon Park's damage evidence to be cursory, summary allegations. We disagree.
 {¶ 50} To recapitulate, the trial court determined that appellants, and not Great Lakes, breached the contract in the instant matter. As we concluded above, the trial court's finding that inaccurate surveying by appellants' surveyor prevented Great Lakes from completing the project in a timely fashion was not against the manifest weight of the evidence. The inaccurate staking delayed Great Lakes' work on the project and caused deficiencies in Great Lakes' performance. As a result of these deficiencies, Chardon Park had to hire additional contractors to remedy some of the inaccurate work performed by Great Lakes. Chardon Park filed a complaint against Great Lakes and, at trial, submitted damage evidence in the form of invoices and cancelled checks from the multiple contractors that worked on the property to remedy the deficiencies.
 {¶ 51} Although appellants submitted this damage evidence, the trial court ultimately found that appellants, and not Great Lakes, were in breach of the contract. Thus, mere receipts were insufficient to establish that the need for the additional work was solely due to any breach of Great Lakes. It is well-established that a breaching party is not entitled to collect damages from a non-breaching party. Sites v.Moore (1992), 79 Ohio App.3d 694, 701. As such, the trial court's finding that Chardon Park's damage evidence contained cursory, summary allegations was supported by competent, credible evidence. The finding was not against the manifest weight of the evidence.
 {¶ 52} Appellants next argue that the trial court's finding that Marla Parkway was not entitled to delay damages is against the manifest weight of the evidence. We disagree.
 {¶ 53} Appellants claim that, as a result of Great Lakes' breach, Marla Parkway, the ultimate owner of the property, lost the profits relating to the lease entered into between Chardon Park and Lake Hospital. The lease was entered into on December 17, 2001. According to the lease, Lake Hospital was to lease office space on the site for a period of ten years commencing on the first month after substantial completion of the premises. The lease specified that if the project was not substantially completed by September 1, 2001, which the project was not, Lake Hospital was to be credited with a day of free rent for each day the project was not substantially completed. Lake Hospital also had the right to terminate the lease if the project was not substantially completed by November 1, 2002. Over the course of ten years, Marla Parkway would have generated income from this lease in an amount of approximately $2.3 million.
 {¶ 54} No evidence was admitted demonstrating whether the project was substantially completed by November 1, 2002 or whether Lake Hospital remained a party to the lease while the project was not complete. Accordingly, appellants did not satisfy their burden to demonstrate that Marla Parkway suffered any loss of profit damages due to Great Lakes' alleged breach of the contract. Accordingly, the trial court's finding that Marla Parkway was not entitled to damages was supported by competent, credible evidence. The finding was not against the manifest weight of the evidence.
 {¶ 55} Appellants next argue that the trial court erred by finding that Great Lakes' mechanic's lien was truthful and accurate. We disagree.
 {¶ 56} R.C. 1311.06 permits a subcontractor to lien the property upon which it made improvements pursuant to the contract "for the amount due over and above all legal setoffs." Great Lakes filed a mechanic's lien against the property on August 9, 2001, for an amount of $72,026.09. Great Lakes attributed part of the balance to work performed under the contract which had not been paid, and the other amounts related to additional services and labor provided by Great Lakes, which were not contained in the contract, but performed upon the request of Chardon Park.
 {¶ 57} As we indicated above, the trial court's finding that Great Lakes completed the contract, and in a timely fashion, was supported by competent, credible evidence. According to the contract, completion of the contract entitled Great Lakes to a payment in the amount of $162,000. As demonstrated by cancelled checks in the amounts of $50,000 and $29,500, Chardon Park paid Great Lakes $79,500. As such, an amount of $82,500 remained due under the contract. Further, the amount due under the unpaid invoices that Great Lakes actually submitted into evidence totaled $81,359.11.
 {¶ 58} Following this logic, the trial court's finding that Great Lakes' mechanic's lien was truthful and accurate was supported by competent, credible evidence. The finding was not against the manifest weight of the evidence, and appellants' argument is not well-taken.
 {¶ 59} In summary, appellants' second assignment of error is without merit. Competent, credible evidence supported the trial court's findings that Great Lakes completed the contract in a timely manner; inaccurate staking prevented Great Lakes from completing the project; Chardon Park's damage evidence contained cursory, summary allegations; Marla Parkway cannot recover delay damages; and Great Lakes' mechanic's lien was truthful and accurate.
 {¶ 60} We realize that the record is unclear as to whether appellee completed all the tasks associated with the contract; however, any determination as to whether appellee completed its contractual obligations does not affect our decision.
 {¶ 61} Appellants' two assignments of error are without merit, and we hereby affirm the judgment of the trial court.
Ford, P.J., O'Neill, J., concur.
[1] It is worth noting that Great Lakes essentially alleges it has performed $150,751.11 worth of services, as demonstrated by the $72,026.09 mechanic's lien and the previous payments from Chardon Park in the amount of $79,500, as demonstrated by cancelled checks in the amounts of $50,000 and $29,500. According to the contract, Great Lakes was to complete the entire contract for a total amount of $162,000.
[2] Although the record demonstrates that Marla Parkway owned the property, the lease was between Chardon Park and Lake Hospital.