DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant Eileen MacDowell, Executrix of the Estate of Mary Maxwell, appeals from the trial court's judgment in favor of Appellee, Anthony DeCarlo in the Summit County Probate Court. We affirm.
 I. {¶ 2} On December 12, 2003, Appellant Eileen MacDowell ("Eileen"), Executrix of the Estate of Mary Maxwell ("Estate"), filed a complaint for declaratory judgment, which complaint was amended on June 7, 2004 (the "Complaint"). The Complaint asked the probate court to: (1) determine the right, title and interest of the parties in the assets of Mary Maxwell ("Mary"); (2) permanently enjoin Defendant Anthony DeCarlo from transferring any of the assets of Mary Maxwell; (3) adjudge the Estate as the sole owner of specified assets; (4) adjudge Mr. DeCarlo to be without rights to the specified assets; (4) order Mr. DeCarlo to pay the Estate the value of the specified assets; (5) order Mr. DeCarlo to pay the Estate's attorney fees and costs; and (6) grant any further relief the court deems just and equitable. The assets at issue were:
 1. Mercury Machine Profit Sharing Plan ($268,000) ("Profit Sharing Plan")
 2. Charter One Bank account 092-928081-7 ($110,000); Charter One Bank account 003-3-25046-0 ($60,000); and Charter One Bank account 003-3-21682-3 ($40,000) (collectively the "Charter One accounts")
 3. Ohio Savings Bank account 36-0044683 ($31,000) ("Ohio Savings account")
 4. Nationwide annuity 015523264 ($49,000) ("Annuity")
 5. 2000 Infiniti automobile ($20,000) ("Infiniti")
 6. 1997 Buick automobile ($10,000) ("Buick")
 7. Personal property ($35,000)
 {¶ 3} The case was tried to the court on November 22-23, 2005. On June 1, 2006, the trial court entered findings of fact and conclusions of law (the "Judgment Entry"). The Judgment Entry rendered judgment in favor of Mr. DeCarlo on claims arising from all of the Charter One bank accounts and the Ohio Savings bank account, and from the Profit Sharing Plan and Annuity. The Judgment Entry also found the transfers of the Infiniti and the Buick to be Court of Appeals of Ohio, Ninth Judicial District defective and determined both vehicles to be assets of the Estate. The Estate has timely appealed the Judgment Entry and raises four assignments of error for review.
 II. Assignment of Error One "A fiduciary in a confidential/fiduciary relationship who engages in self-dealing by converting the property of the person who has reposed trust in him commits a breach of trust which as a matter of law gives rise to a constructive trust upon the converted property and/or a personal judgment against the fiduciary. The trial court's conclusion to the contrary was clearly erroneous."
 Assignment of Error Two "A fiduciary who acquires property allegedly as a gift from the person who has reposed trust in him must prove by clear and convincing evidence the essential elements of a valid gift and the absence of undue influence, or a constructive trust will be imposed upon the converted property and/or a personal judgment rendered against the fiduciary. The trial court's conclusion to the contrary was clearly erroneous."
 {¶ 4} Because our analysis of each of the Estate's first and second assignments is related, we will discuss them together. The Estate asserts that Mary and Mr. DeCarlo had a fiduciary relationship. As such, transfers of assets from Mary to Mr. DeCarlo should be automatically deemed to be a conversion of property thereby rendering any transfer void as a matter of law and requiring the court to impose a constructive trust or render judgment against the fiduciary. The Estate also asserts that the only exception to this rule is where the fiduciary is able to establish by clear and convincing evidence that any assets transferred were a gift from the decedent, which Mr. DeCarlo failed to do.
 {¶ 5} Mr. DeCarlo asserts that he did not have a fiduciary relationship with Mary, that any dispute related to the Profit Sharing Plan, the Annuity and the bank accounts is governed by contract law and that the contractual obligations of the parties are presumptively valid absent a showing that Mary lacked capacity to enter into the contracts or was unduly influenced to enter into them by Mr. DeCarlo.
 {¶ 6} Both of the Estate's assignments of error argue and assume a fiduciary relationship existed between Mary and Mr. DeCarlo. The trial court, however, did not address this argument and did not make such a finding nor did the Estate's complaint seek such a finding. Instead, the Judgment Entry, entered pursuant to Civ.R. 52, at the request of the Estate, found that Mary had capacity to make the transfers and that Mr. DeCarlo did not unduly influence her to do so, thereby holding the transfer of the assets (except the Infiniti and the Buick) to Mr. DeCarlo proper.
 {¶ 7} Civ.R. 52 provides as follows:
 "When questions of fact are tried by the court without a jury, judgment may be general for the prevailing party unless one of the parties in writing requests otherwise before the entry of judgment pursuant to Civ.R. 58, or not later than seven days after the party filing the request has been given notice of the court's announcement of its decision, whichever is later, in which case, the court shall state in writing the conclusions of fact found separately from the conclusions of law." See, also Kimbel v. Clark, 9th Dist. No. 22647, 2005-Ohio-6741, at ¶ 6.
 {¶ 8} The purpose of Civ.R. 52 is "'to aid the appellate court in reviewing the record and determining the validity of the basis of the trial court's judgment.'" In re Adoption of Gibson (1986),23 Ohio St.3d 170, 172, 492 N.E.2d 146, quoting Werden v. Crawford (1982),70 Ohio St.2d 122, 124, 435 N.E.2d 424. "In light of its purpose, while there is no precise rule regarding compliance with Civ.R. 52, the findings and conclusions must articulate an adequate basis upon which a party can mount a challenge to, and the appellate court can make a determination as to the propriety of, resolved disputed issues of fact and the trial court's application of the law." New Haven Corner Carry Out, Inc. v.Clay Distrib. Co., 3rd Dist. No. 13-01-30, 2002-Ohio-2726 at ¶ 63 citingStone v. Davis (1981), 66 Ohio St.2d 74, 85, 419 N.E.2d 1094. This Court will not reverse the trial court's findings of fact if they are supported by some competent and credible evidence in the record.Jaroch v. Madalin, 9th Dist. No. 21681, 2004-Ohio-1982, at ¶ 8, citingHuff v. Huff, 9th Dist. No. 20934, 2003-Ohio-1304, at ¶ 22.
 {¶ 9} It is well established that it is not error for a trial court to adopt, verbatim, a party's proposed findings of fact and conclusions of law based upon a theory that may differ from that of another party.Chardon Park, Inc. v. Great Lakes Crushing. Ltd., 11th Dist. No. 2003-G-2524, 2004-Ohio-7221 at ¶ 37-39. Accordingly, it is certainly not error for the trial court to prepare its own findings of fact and conclusions of law based upon its adoption based on the evidence presented at trial of a particular theory or argument although it is not the theory or argument the Estate may have asserted, as long as there is a basis in law and fact for the trial court's finding. In such case, error can only be found when the findings of fact and/or conclusions of law are against the manifest weight of the evidence. Id, at ¶ 39. Here, the trial court found in favor of Mr. DeCarlo based upon Mr. DeCarlo's theory that the asset transfers were proper pursuant to the contracts that governed them, absent a showing of incapacity or undue influence. The trial court did not find and was not required to find a fiduciary relationship between Mary and Mr. DeCarlo. Accordingly, the trial court does not need to address any legal arguments that may assume such a relationship.
 {¶ 10} To the extent that the Estate claims error because the Judgment Entry is against the manifest weight of the evidence, we will address this argument relative to the Estate's third assignment of error. As to the Estate's first and second assignment of error, we find that the proposed findings and conclusions did articulate an adequate basis upon which this court can make a determination as to the propriety of resolved disputed issues of fact and the trial court's application of the law. Therefore, the Estate's first and second assignments are overruled.
 Assignment of Error Three "The weight of the evidence consists of a series of unusual and suspicious circumstances which amount to a superabundance of compelling evidence demonstrating that the fiduciary/transferee/donee did not prove by clear and convincing evidence the essential elements of an alleged gift and/or the absence of undue influence. The trial court's conclusion to the contrary was clearly erroneous."
 {¶ 11} The Estate asserts that the trial court's judgment finding that Mr. DeCarlo did not unduly influence Mary is against the manifest weight of the evidence. The Estate further asserts that the weight of the evidence fails to establish that Mary gifted any of her assets to Mr. DeCarlo and the trial court's finding otherwise was erroneous.
 {¶ 12} We begin by noting that the trial court made no finding as to whether or not Mr. DeCarlo had established by clear and convincing evidence, or otherwise, that Mary had gifted her assets to him. As discussed above, the court analyzed this matter utilizing the contract law theory proposed by Mr. DeCarlo, which only required a finding of undue influence or lack of capacity to void the Profit Sharing, Annuity and joint and survivorship bank account contracts that benefited Mr. DeCarlo. An analysis of whether there had been valid gifts to Mr. DeCarlo was not necessary since the Court did not find there to be a fiduciary relationship between Mary and Mr. DeCarlo. Accordingly, we will not address that portion of this assignment related to the trial court's failure to find that the decedent had not validly gifted assets to Mr. DeCarlo.
 {¶ 13} As to the court's failure to find undue influence despite the alleged "superabundance" of evidence to the contrary, we review whether a judgment is against the manifest weight of the evidence in a civil context utilizing the same standard of review as that used in the criminal context. Frederick v. Born (Aug. 21, 1996), 9th Dist. No. 95CA006286, at *6. This Court must, therefore, "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340,515 N.E.2d 1009.
 {¶ 14} Further, this Court has stated that it "will not reverse the judgment of the trial court as being against the manifest weight of the evidence if the judgment is based upon some competent, credible evidence that speaks to all of the material elements of the case." Morris v.Andros, 158 Ohio App.3d 396, 2004-Ohio-4446, at ¶ 18. "This standard is highly deferential and even `some' evidence is sufficient to sustain the judgment and prevent reversal." Bell v. Joecken (Apr. 10, 2002), 9th Dist. No. 20705, at *2. It is well established that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus. The trier of fact is in the best position to judge the credibility of the witnesses, view their demeanor and weigh the evidence. Akron v. Portman, 9th Dist. No. 22921,2006-Ohio-2856, at ¶ 13; DeHass, at paragraph one of the syllabus.
 {¶ 15} "'The elements of undue influence include the following: (1) a susceptible party; (2) another's opportunity to exert influence; (3) the fact of improper influence exerted or attempted; and (4) the result showing the effect of such improper influence.'" Modie v. Andrews (July 26, 2000), 9th Dist. No. 19543, at *3, quoting Lah v. Rogers (1998),125 Ohio App.3d 164, 171, 707 N.E.2d 1208. To determine whether the particular influence was undue, a court must consider "'whether the influence was reasonable, given all the prevailing facts and circumstances.'" Modie, at *3, quoting Krischbaum v. Dillon (1991),58 Ohio St.3d 58, 68, 567 N.E.2d 1291.
 {¶ 16} During the two day course of the trial, the trial court heard from 24 witnesses, including the executrix of the Estate and Mr. DeCarlo.
1. Mr. DeCarlo ("Tony")
 {¶ 17} Tony testified as the first witness during the Estate's case in chief. He testified as to his long history with Mary and her family and acknowledged that he and Mary, while previously married to each other, were not married at the time of her death. Following their divorce, they had lived together for nearly 20 years in Mary's condominium. Tony moved in with Mary because he had a heart attack and Mary offered to take care of him. Tony testified that he and Mary had a very close relationship.
 {¶ 18} Tony and Mary had a non-traditional living situation in that Tony took care of the household duties and Mary earned the income. All of the expenses of the couple were paid out of Mary's bank accounts. Tony's only income was Social Security. Tony acknowledged that he had no personal assets other than Mary's assets.
 {¶ 19} After Mary got sick and during her 18 month last illness, Tony tended to all of her needs, including paying her bills. He was authorized to write checks from Mary's bank accounts. Mary also gave Tony permission to use her credit cards to buy things for her. Tony considered himself to be like a guardian to Mary and stated that he and Mary had a relationship of complete trust and confidence.
 {¶ 20} Tony acknowledged that he had known the executor of the Estate, Eileen, since she was an infant. He knew Eileen better than anyone else knew her and acknowledged that that both Eileen and her mother Marilyn were truthful people and he had never known them to lie. Tony did not recall ever acknowledging a statement Mary made that he was selfish in wanting her condominium when he had the bank accounts although he so testified in deposition. He acknowledges that Mary never told him she would leave him all of her assets.
 {¶ 21} Tony and Rich Nickel (Mary's good and trusted friend, "Rich") visited Mary every day in the hospital and nursing home. Tony admitted he told Mary's other friends and relatives that she did not want visitors or phone calls. He did this, despite the fact that Eileen and Marilyn were listed as responsible parties on Mary's living will, durable power of attorney for health care, and general power of attorney. Tony testified that his name was a handwritten addition to Mary's living will that was printed by a nurse at the nursing home.
 {¶ 22} Tony was not present when Mary made her last will and testament in 1999 or her first will in 1993. Tony did not find Mary's 1999 will (the "Will") until after she was sick. Tony asked Mary why she had left everything to Eileen but Mary did not answer him. Mary never indicated to him that she had changed her mind about the beneficiaries under her Will after that, although she did tell him that she wanted to change the Will.
 {¶ 23} Tony admitted that he visited an attorney after he found the Will. He asked Attorney James Pearl to draft a new will for Mary and to prepare a quit claim deed for the condominium. He acknowledged that Mr. Pearl knew at that time that Tony was already the beneficiary of the Profit Sharing Plan and the Annuity and that the automobiles had already been transferred to him.
 {¶ 24} During the course of their relationship, Tony had signed Mary's name on various receipts, charges and refund slips. Tony acknowledged his signature on two withdrawal slips withdrawing money from Mary's bank account while Mary was still alive, but insisted any withdrawals or signatures were only made with Mary's permission.
 {¶ 25} Regarding the Buick and the Infiniti, Rich helped Tony transfer the automobiles from Mary's name into his name. Rich suggested that Mary do this so that Tony could get the cars e-checked. Tony removed the titles from Mary's strong box and brought them to the hospital for her signature. Rich and his daughter, Gabriel, witnessed Mary's signature on the power of attorney form and the assignment section of the title. Mary's signatures were notarized at the time she signed them by Jackie Mauer. Mary did not sign the "application for certificate of title" section of the title; Tony signed her name using his power of attorney because Mary was tired.
 {¶ 26} Regarding the Annuity, Rich filled out the forms for Mary to sign directing the insurance company to surrender the proceeds to herself and her "husband," Tony. He cashed the check in the amount of $48,000, made payable to both Tony and Mary, after Mary died. Tony called IL Annuity to ask them to reissue the check just in his name before Mary died, but they would not do it. Tony states he did not tell Mary to designate him the beneficiary of the Profit Sharing Plan.
 {¶ 27} Tony found Mary's burial instructions in her strong box. He did not comply with them in that he held a visitation, had an open casket and a memorial service, and did not bury her in Lakeview cemetery near her father as she requested.
 {¶ 28} At the time of the trial Tony lived in a condominium owned by his sister in law, but paid for by Tony from an annuity (Golden American) he purchased with the proceeds of Mary's Profit Sharing Plan. Tony acknowledged that Rich is a 25% beneficiary of his Golden American annuity because Rich and Mary "bummed cigarettes off each other."
 {¶ 29} Tony never made financial decisions for Mary nor handled her financial transactions. Sometimes he would go to the bank for Mary and complete a transaction that Mary had pre-arranged by telephone with the banker, Donna Hartman.
2. James Pearl, Esq.
 {¶ 30} Mr. Pearl is a probate attorney engaged by Tony in the fall of 2002. He met with Tony more than ten times but he was not sure if the subject of each meeting was Mary. He generally recalled that he met with Tony to discuss estate planning for Mary and how to transfer property or make people beneficiaries. They discussed both inter vivos gifts and transfer on death. He acknowledged that they may have discussed a new will for Mary, but he did not prepare one because her illness had created a lot of turmoil. He prepared a transfer on death deed for Mary's condominium at Tony's request. He never met with or communicated with Mary. Mary never came to his office and he never went to her condominium or the hospital. He did not believe he ever spoke to Mary by telephone. He relied on Tony's representations about what Mary wanted done. His typical practice was to always speak to the person before drafting any documents and he has declined to draft such documents where he could not do so. The transfer on death deed was never signed to his knowledge.
 {¶ 31} Tony also consulted with him about common-law marriage and whether he could establish that he and Mary had such a marriage. Mr. Pearl knew that Tony and Mary were not legally married. He and Tony consulted with another attorney on the issue of common-law marriage. The referral attorney told Tony that the language of Mary's estate planning documents presented an uphill battle to proving that Tony was married to Mary. Both attorneys declined to represent Tony in any claim that he had a common law marriage with Mary.
3. Dana McLafferty
 {¶ 32} Ms. McLafferty worked with Mary at Mercury Machine between 1996 and 2000. Mary was an excellent employee and made very few mistakes. Mary would double and triple check all of her paperwork. Mary trusted Rich and Tony, but trusted Rich more regarding financial matters. Mary asked Rich for investment advice. Tony handled everything else for Mary. Ms. McLafferty visited Mary often in the hospital until Rich told her not to visit anymore because she was causing friction with Tony's sister, Mary Kudelski. She never saw Eileen at the hospital or nursing home.
 {¶ 33} Employee retirement forms are stored in a locked filing cabinet at Mercury Machine. About a year before she died, Mary asked Ms. McLafferty to whom she should leave her property. When Ms. McLafferty suggested Tony, Mary responded that she did not want his "fucking Dago family to have it."
 {¶ 34} After Mary left Mercury Machine, about a year before she died, she called and asked Ms. McLafferty to look in the top drawer of Mary's old desk. In the drawer Ms. McLafferty saw a typed retirement beneficiary form. While most people handwrote such documents, Mary always typed everything. The form listed Eileen "MacDonald" as the alternate beneficiary, not "MacDowell." Tony was the primary beneficiary. Mary knew the exact location of the form in her drawer and never told Ms. McLafferty that she wanted to change it. Ms. McLafferty looked at the form and put it back. Mary did not ask her to put it in the filing cabinet.
 {¶ 35} Mary was the type of person that gave direction and took control, including over Tony. Mary's wants and need were important to the couple. Ms. McLafferty visited Mary in the hospital on the day she died. Even on that day, Mary was as stubborn and strong as always.
4. John Dipre, Robert Radl, Allen Wake,
 {¶ 36} Mr. Dipre is a principal in Dipre, Brodnik Associates, an annuities and life insurance brokerage company who sold Mary a Transamerica/IL annuity that is not at issue in this case. Mr. Radl and Mr. Wake were Mary and Tony's neighbors. Each of the three testified that they knew that Tony and Mary were not married.
5. Mary Kudelski
 {¶ 37} Mary Kudelski is Tony's younger sister. She knew Mary for her entire life. She assisted Tony in taking care of Mary during her last illness and was holding her hand when she passed away. Mary was a trustworthy person who trusted Tony. Her brother was like a guardian to Mary. He was her carpenter, shopper, and cook. Mary often told Tony what to do and Mary made all of her own decisions. Mary was the boss until she passed away.
 {¶ 38} Mary told her brother to sign medical forms as needed; Mary even told Ms. Kudelski to sign a form once at Marymount Hospital. She saw Eileen at the hospital once and was present when Tony called Eileen to tell her that Mary was in the hospital. She remembers that Eileen declined to come to the hospital to visit Mary because she was painting. She also saw Mr. Chinnock (Tony's trial counsel) at the hospital but Mary told him to leave. She did not know if Mr. Chinnock asked Mary any questions before he left.
6. Gail Nickel
 {¶ 39} Gail Nickel ("Gail") is Rich's wife and Mary's good friend. Mary first complained to her of stomach problems in the spring of 2002. Mary first went to the doctor about her stomach in July of 2002. Despite Mary's pain, she was able to conduct herself rationally.
 {¶ 40} Mary told Gail that Eileen was the executrix of Mary's estate and a beneficiary. Rich and Tony also told her before Mary died that Eileen was going to inherit Mary's estate. One night after a visit to Mary in the hospital, Rich told Gail that Mary wanted Tony to have Mary's retirement fund and that Rich was going to help Mary process the paperwork.
 {¶ 41} Mary and Tony had an excellent relationship. Mary did not have a good relationship with Eileen. In November of 2001, Mary told Gail that she was no longer going to buy gifts for Eileen's children because Eileen did not call her, invite her over, or thank her and Mary did not like her anymore or want anything to do with her.
7. Judith Monroe
 {¶ 42} Judith Monroe ("Judy") was Mary and Tony's neighbor. She knew Mary and Tony for 25 years. They had a close relationship and vacationed together. Mary was meticulous about everything in her life. Judy visited Mary in the hospital but was told by another neighbor that Tony did not want any more visitors, although she knows that Rich continued to visit. She asked Tony at least six times if she could visit Mary and was told no. She did not believe that Mary did not want visitors. When she did visit Mary, Mary always seemed glad she was there. Judy believed there was only one reason Tony did not want anyone to visit Mary. She believed that Tony and Rich were "working her over" to get her assets and they did not want anyone else "muddying the water." Judy had no facts to show that Tony influenced Mary and believed that Rich had more influence than Tony. She believed Tony was devastated when Mary died and he did not inherit her assets.
 {¶ 43} On cross-examination, Judy admitted that she was not aware that numerous other people visited Mary in the hospital and Judy admitted that when she did go visit Mary, no one stopped her from entering the room. She acknowledged that Mary "wore the pants in the family." She knew that Tony was spending a lot of money when Mary was sick and did not know if Mary's bank accounts were joint accounts. She had been shopping with Tony and Mary on previous occasions and it was always Mary that spent the money.
 {¶ 44} She knew that Jackie Mauer notarized Mary's signature on the car titles, but not in Mary's presence. Jackie told her that she should never have notarized the titles without being in Mary's presence.
8. Robert Alt, Yvonne Alt, and Vince DeCarlo
 {¶ 45} The Alts were Tony and Mary's neighbors and Vince DeCarlo was Tony's nephew. Each knew Mary and Tony well and each testified that Mary and Tony had mutual trust and confidence in each other and that Tony was like a guardian to Mary. Tony took care of the cars, the cleaning and cooking for Mary. Tony and Mary did everything together. Each stated that Mary was a strong-willed person who wanted to make Tony happy. Yvonne acknowledged that no one ever stopped her from visiting Mary. Vince stated that Mary was making her own decisions up until the day she died.
9. Richard Nickel
 {¶ 46} As set forth above, Rich was Mary's good friend and co-worker at Mercury Machine. He testified that Mary was virtually error free in her work. He and Mary had a mutual relationship of trust and confidence; they had been friends since 1979. Mary and Tony also had a relationship of trust and confidence. Mary and Tony were not married.
 {¶ 47} Rich had seen Mary's Profit Sharing Plan beneficiary form. There were no company safeguards to ensure the authenticity of an employee's signature. He was the number two man at the company. It was not one of his job duties to handle employee profit sharing plans and he did not have the authority to get involved in employee financial matters. He did help Mary change the designation on the Profit Sharing Plan because she was his friend. He acknowledged that he could have gotten in trouble with the company for helping Mary with this. Mary showed him her Profit Sharing Plan designation form (Exhibit 19) on her last day of work "just in case." The form listed Tony as the primary beneficiary and this did not surprise Rich. He knew Mary's signature and knew that she signed the document although he did not assist her in signing it. He did not help Tony collect the proceeds of the Profit Sharing Plan. It is Tony's handwriting on the distribution request form for the Profit Sharing Plan (Exhibit 27).
 {¶ 48} Rich helped Mary with investment advice and went with her to an investment advisor when she purchased both of her annuities, including the Annuity. Tony was not present at any meetings related to the annuities.
 {¶ 49} Rich assisted Mary with the surrender of her annuities at her request. She asked him to do this by writing her request on a piece of paper or a dry erase board. The paper would have been thrown away and the dry erase board was erased. He remembered the surrender distinctly because both he and Mary cried when reading the reference to a terminal illness on the form. He thought Mary finally came to the realization that her illness was terminal when she read that form. The process of surrendering the annuities was a long one and required him to obtain statements from Mary's doctors as to the status of her health.
 {¶ 50} A few days before Mary died, he was communicating with Nationwide regarding the surrender of the Annuity. He filled out the form for Mary and she signed it. The form stated that Tony was Mary's husband; no one directed Rich to complete the form that way. He remembered once Mary referred to Tony as her spouse, although he knew they were not married. He did not remember what (if anything) Mary said when she signed the form; she could barely speak because of a stroke. That annuity was cashed in and a check received for $48,600 payable to Mary and Tony.
 {¶ 51} Rich also prepared forms for Mary to sign related to another annuity that is not at issue in this case (the "IL Annuity"). He faxed the forms to the insurance company within 36 hours of Mary's death. He remembered that Mary had an I.V. in her arm and was unable to speak when she signed the forms in his and Tony's presence. He did not remember if Mary communicated to him at the time she signed the forms. These forms also indicated that Tony was Mary's husband even though Rich knew that not to be true. The proceeds of this annuity were made payable only to Mary. He did not recall any attempt to get IL Annuity to reissue the check to Tony.
 {¶ 52} He was intimately involved in transferring Mary's cars to Tony. Mary always referred to the Buick as Tony's car and the Infiniti was hers. The purpose of the transfer was so that either Tony or Mary could get the cars e-checked and obtain license plates. Mary asked Rich to do this a few days before she went into the hospital. He obtained the power of attorney forms for Mary to sign. She signed the powers of attorney when she was in the hospital although he cannot specifically remember seeing her sign them. Rich knew that she did not usually sign a document before it was completed. The form was filled in when she signed it. He believed Tony prepared the forms. Rich's daughter, Gabriel, witnessed Mary's signatures, but he did not specifically recall seeing her sign. Neither of Rich or Gabriel would witness a document before the person actually signed it. No one held the pen for Mary. It was Mary's signature on the power of attorney. He knew Jackie Mauer (the notary) but could not remember if she was in the room when Mary signed the powers of attorney. He was not present when Mary signed the other documents related to the car transfer; he knew the signature on the application for certificate of title was not Mary's; Tony signed for Mary as her power of attorney.
 {¶ 53} During her last illness, Rich visited Mary nearly every day. Tony and his sister Mary were there every day as well. Mary was thrilled when people came to visit her even though she complained about it. He never saw Eileen at the hospital or nursing home. He did not even know Eileen existed until the night Mary died. Mary never discussed Eileen with him.
 {¶ 54} Rich was very upset with Tony when he found out that Tony listed him as a beneficiary of Tony's profit sharing plan. Tony did this without his knowledge and he asked Tony to remove him as beneficiary.
10. David Mazanec
 {¶ 55} Mr. Mazanec is an estate planning attorney who represented Mary. Mary was introduced to him by her financial advisor, John Dipre. Mr. Mazanec prepared Mary's will, durable general power of attorney, durable health care power and living will. He did not prepare Mary's first will but he has seen it. He obtained the information for the documents he prepared for Mary by meeting with her and Mr. Dipre and then obtaining additional information by fax. Eileen MacDowell was named as the executrix of Mary's will and the designee under the power of attorney and health care documents. The alternate was Marilyn O'Brien. Mary was unmarried and never told him about a potential common law spouse. It was his understanding that common law marriage was abolished in 1999. Mary never mentioned Tony's name during the estate planning process and his name did not appear on any of the documents that Mr. Mazanec prepared.
 {¶ 56} Mr. Mazanec did not handwrite Tony's name as the third position designee on Mary's living will. His file copy of Mary's living will did not have Tony's name on it. He did not know who wrote Tony's name on the document. The revised living will only gave Tony the right to receive notice of a potential termination of life support for Mary and then to bring an action in probate court if necessary.
 {¶ 57} The Will covered Mary's assets that would be subject to the probate process, such as non-titled assets that were only in her name without a beneficiary designation. Mr. Mazanec advised his clients of what types of assets a will covers. He also advised clients that, if they wish to change their estate planning documents, they should contact him because he keeps all documents on his computer for later revision.
 {¶ 58} Mary signed all of the documents in his office but he did not witness her signature. His assistant and Mr. Dipre were the witnesses.
11. Kathy Scheiber and Christine Baker.
 {¶ 59} Ms. Scheiber is a registered nurse who works as the head nurse at Marymount Hospital. Ms. Baker is the director of nursing at Hudson Elms Nursing Home where Mary resided. Neither wrote Tony's name on Mary's living will and did not know who did.
12. Lawrence Mihevic
 {¶ 60} Mr. Mihevic is a financial planner who worked with Mary beginning in 2000 and sold her the Annuity. Mary came to him because she was concerned about the propriety of the annuities she held and her overall retirement plan. At the time she came to him, Mary had already designated beneficiaries of the Profit Sharing Plan and her annuities and he did not question those. He did advise her to review and update her beneficiaries if needed. He understood her to be unmarried. Rich accompanied Mary to Mr. Mihevic's office. Rich was acting as an advisor to Mary. Tony never attended any meeting in his office. Tony was never identified to him.
 {¶ 61} Mary named Eileen as the beneficiary of the Annuity. Mr. Mihevic did not recall that Tony was ever mentioned as a possible beneficiary. Bonnie Lancaster was the original named annuitant, but she was replaced by Mary at a later date.
13. Michelle Lopez
 {¶ 62} Ms. Lopez is a LPN at Hudson Elms Nursing Home who acted as a charge nurse in the hall where Mary resided. In the nurses' notes of November 25, 2004, she wrote that she asked Tony if he wanted Mary to go to the hospital and he said no. This was the day before Mary died.
14. Alice Sloey
 {¶ 63} Ms. Sloey was a friend of Mary's. Mary was a very private person. Tony is like a brother to Ms. Sloey and she would do anything to help him, but would not lie. Mary did not like people to see her when she was not at her best and/or did not feel well. Tony told Ms. Sloey that Mary did not want anyone to visit. Ms. Sloey visited her in the nursing home twice and did not visit her in the hospital. When she spoke with Mary, Mary's voice was weak.
 {¶ 64} A few weeks before Mary went into the hospital, Ms. Sloey was present when Mary told Tony that she had to remember to bring home her profit sharing papers from work for Tony to sign so he could be the beneficiary. She was also present when Mary brought the papers home and directed Tony to do what he needed to do to make sure benefits were transferred to him. Mary gave Tony a pen and Tony put his social security number on the form and signed it. Ms. Sloey did not see Mary sign the forms. When presented with the Profit Sharing Plan beneficiary designation form, she admitted that Tony's signature and social security number were not on it. She admitted that it was unusual for Mary to have this type of discussion in the presence of someone else because Mary was so private. Mary was having abdominal pain during this time and everyone tried to convince her to see a doctor.
20. Theodore DeCarlo
 {¶ 65} Theodore DeCarlo is Tony's nephew. Tony was like a father to him. He also knew Mary for his entire life. Mary trusted most people, including Tony. Rich was Mary's best friend besides Tony. Rich regularly gave Mary investment advice and Mary had confidence in that advice. Theodore lived in a condominium that was titled in his name although Tony paid for it with funds from an annuity.
21. Jackie Mauer
 {¶ 66} Ms. Mauer is a defendant in this case, was a good friend of Mary's and remained a good friend of Tony. She and Judy Monroe were also friends. She was the notary on the title transfer documents for Mary's cars. She admitted that she notarized Mary's signatures on the documents at Tony's request even though she did not see Mary sign the documents. She did, however, notarize them in front of Mary and Mary knew what Jackie was doing. She never saw Tony force Mary to do anything.
22. Marilyn O'Brien
 {¶ 67} Marilyn O'Brien ("Marilyn") is Eileen's mother and was Mary's first cousin. Marilyn's father, Bill Chinnock was Mary's mother's brother. Mary was very close to her aunt and uncle and cousins. Mary's father died when she was young and Mary considered her Uncle Bill to be like a father. Mary's mother, Agnes, and Uncle Bill were very close. Eileen was also very close to Tony and first met him when she was a kid. When Tony had his health issues, Mary's family was glad that he moved back in with Mary. Mary and Tony had a mutual relationship of caring, trust and confidence. Mary had a mind of her own, but she always had a soft spot for Tony. Tony did a lot for Mary to take care of her.
 {¶ 68} In 1989, Mary told Marilyn that she wanted to leave her condominium and other things to Eileen. Mary never told her she changed her mind about this. In 2000, Mary reminded her of her promise from 1989 to make Eileen a beneficiary of her estate and the executrix of her will. Marilyn asked Mary about Tony during this conversation and Mary told her Tony was very well set.
 {¶ 69} In 2002, Tony called Eileen to let her know that Mary was in the hospital but that Mary did not want any visitors or phone calls. She and Eileen were hurt by this and went to the hospital. Upon their arrival, they learned that Mary had been diagnosed with pancreatic cancer. Tony also told them that he wondered to whom Mary left her condominium. Tony told them he had asked Mary about this and Mary had said, "Tony, you're being selfish. You want everything. You have all the bank accounts." They were upset that Tony would bring up the topic of Mary's assets when Mary had just been diagnosed with cancer. After this, Tony told them that Mary did not want any visitors, but they were never stopped from seeing her in the nursing home. She only saw Mary in the hospital once.
 {¶ 70} Marilyn was present at Mary's memorial service when Tony made a scene about giving Eileen Mary's Will and the deed to the condominium that Eileen had previously asked for. She and Eileen wanted to work things out with Tony but felt that he was negotiating in bad faith.
 {¶ 71} Marilyn knew her brother, Mary's first cousin, and plaintiff's counsel in this case, went to see Mary when she was in the hospital. She denied asking him to talk to Mary about her assets and stated that Bill only went to see Mary because she was sick and they were close cousins.
23. Eileen MacDowell
 {¶ 72} Eileen was the executrix of Mary's estate and Mary's niece. Mary was close to her Uncle Bill and considered him to be like a father. Mary always treated her like a daughter because Mary had no children of her own. Mary and Tony were married in the 50s, later divorced and then Mary took Tony in after he had a heart attack in the 80's. Tony had no assets or income of his own at that time. Tony was a big part of their lives and they treated him as family. Eileen believed Mary and Tony's relationship was one of friendly convenience. Mary supported Tony financially and Tony took care of all of the household duties. She believes that Mary and Tony had trust and confidence in each other but believed Tony had the power over Mary. Mary asked Tony to move out of her condominium many times, but Tony would convince her to change her mind. Eileen was present with Tony when Mary's obituary was drafted that described Tony as Mary's spouse.
 {¶ 73} In September 2003, defense counsel deposed Eileen about the affidavit she signed in this case when she was concerned about Mary's bank accounts and thought Tony was negotiating in bad faith relative to the resolution of the dispute about Mary's assets. According to Eileen, there were two things in the affidavit that are inaccurate. Tony first contacted Eileen about Mary's hospitalization in September of 2003, not October. Also, Tony updated her about Mary's medical condition, but did not consult her as the affidavit indicated. Tony made all of Mary's health care decisions.
 {¶ 74} Throughout their lives, Eileen and Mary kept in regular contact with each other although they did not see each other frequently. She first learned that Mary intended to name her as a beneficiary from her mother in 1989. Mary's 1993 will provided as Mary indicated and in 1999, Mary called Eileen from Mary's investment counselor's office to verify Eileen's social security number and address because Mary was making her the beneficiary and executrix of her Will. Eileen first learned of her designation on the health care documents after Mary's memorial service when she found the documents in the paperwork that Tony gave her. Tony's name was not mentioned in any of Mary's estate planning paperwork.
 {¶ 75} In September of 2002, Mary called and told her she was having stomach problems and was going to have some tests done. Tony called a few days later to tell her that Mary had been admitted to the hospital. She and her mother went to see Mary and learned about Mary's diagnosis from Tony. After they left Mary's room, Tony referenced Mary's condominium wondering to whom Mary left it. Tony told them he has asked Mary about it and Mary had responded that [Tony] was being selfish because he already had the bank accounts. Tony then said that no one else was entitled to Mary's assets because he had done everything for her. She remembers thinking the timing of this conversation was inappropriate given Mary's recent diagnosis with cancer.
 {¶ 76} Thereafter, Tony told Eileen and her mother that Mary did not want any visitors because she did not look her best. They doubted that Mary did not want to see them but they honored Tony's request. Accordingly, they only visited Mary a few times. If Tony had not kept them away, they would have gone every day. Eileen only spoke to Mary twice by telephone at the hospital. She later learned that other people had gone to see Mary, including Rich Nickel.
 {¶ 77} On the day Mary died, Tony told her that he was going to give her $20,000. She thought it was his guilty conscience speaking. Mary died while Eileen and Tony's sister were in the room.
 {¶ 78} While Mary was hospitalized Tony contacted Eileen when he found Mary's estate planning documents and saw that Eileen was the beneficiary. He asked Eileen what he was going to do because he had nothing.
 {¶ 79} Among Mary's documents were burial instructions dated in 1991. Tony did not comply with Mary's burial instructions. Eileen, as executrix, should have had the opportunity to comply with Mary's wishes, but Tony did not give her the paperwork she requested and she was not aware of the burial instructions until it was too late.
 {¶ 80} Eileen had no personal knowledge as to whether Mary executed the beneficiary designation form for her Profit Sharing Plan but she believed, despite her deposition testimony otherwise, that Tony influenced Mary to name him as the beneficiary. She did not believe that the signature on the beneficiary designation form was Mary's signature or that Mary completed the form because Eileen's last name was incorrect and she has had the last name of MacDowell for twenty years. She did not have any documents that evidence that Mary's signature was a forgery.
 {¶ 81} Eileen acknowledged that some of Mary's bank accounts were joint and survivor accounts with Tony as the survivor. She acknowledged that Mary told her mother that Tony was well set and that he had no assets other than what Mary would be leaving him.
24. Donna Hartman
 {¶ 82} Donna Hartman worked as an assistant manager for Charter One Bank and knew Mary Maxwell for over 20 years. Tony drove Mary to the bank but never came inside with her. Mary opened and closed accounts frequently to take advantage of interest rate changes. Tony never made these decisions. Occasionally Mary would send Tony in to the bank to make a deposit. Ms. Hartman spoke with Mary frequently the last few years of her life about the joint and survivorship nature of her accounts. Ms. Hartman regularly would retrieve the signature cards from the file and confirm for Mary that the accounts would automatically go to Tony if anything happened to Mary. Mary told Ms. Hartman that she wanted to make sure that Tony got her money if something happened to her. The Charter One Accounts were held as joint and survivorship accounts with Tony as the beneficiary.
 {¶ 83} Finally, the trial court watched the video depositions of two doctors, one testifying on behalf of each party, related to Mary's physical and mental condition vis-à-vis her last illness and death.
25. Gerald Sokol, M.D. (Estate's expert)
 {¶ 84} Dr. Sokol was hired by the Estate as an expert to render a medical opinion regarding Mary's last illness and death. To render his opinion, Dr. Sokol reviewed a complete set of Mary's medical records from Marymount Hospital, and Hudson Elms, as well as records from Dr. Scanlon, Mr. DeCarlo's expert. He did not review any deposition testimony including that of Dr. Scanlon.
 {¶ 85} In mid-2002, Mary was 81 years old and was suffering from the symptoms of cancer although she had had not yet been diagnosed. Dr. Sokol believed that Mary's cancer had most likely begun one to two years prior to diagnosis. In mid-2002, Mary was taking various medications for pain and anxiety, including a narcotic, either oxycodone or Percocet (an oxycodone derivative). Oxycodone alleviates pain and causes sedation, lethargy and constipation. It can cause confusion in older people.
 {¶ 86} Dr. Sokol believed undue influence to be the substitution of one's will for that of another. Dr. Sokol believed that, based on her age, health condition, and drug usage, that Mary was susceptible to influence. He believed that anyone with these conditions would be susceptible to influence from a person with whom they are in a relationship, because cancers cause depression, especially pancreatic cancer. Dr. Sokol believes that Mary became more susceptible to influence as the physical difficulties associated with dying manifested themselves.
 {¶ 87} Dr. Sokol reviewed the "do not resuscitate" directive ("DNR") naming Tony as the designee. He did not believe that the DNR order significantly impacted the length of Mary's life because such an order was appropriate for a person in Mary's condition.
 {¶ 88} Dr. Sokol acknowledged that he did not see anything in the medical records related to potential abuse of Mary and that, if such abuse had occurred, it would have been in the records. He acknowledged that the records from Marymount Hospital indicate that Mary was not depressed and did not have emotional issues. He also acknowledged that not everyone with cancer suffers from depression. He noted, however, that the record was completed by an LPN, who may not have had the training to recognize depression or emotional symptoms.
 {¶ 89} Dr. Sokol also acknowledged that there was no indication that Mary was depressed in the nursing home records but he noted that there was an indication that Mary was dysphasic, which means she had a difficult time annunciating words. Such a condition would have made it difficult for Mary to communicate any depression problems she may have been having. Dr. Sokol did not render an opinion as to Mary's competency because counsel acknowledged that mental competency was not an issue in this case.
26. Terrance Scanlon, D.O. (Mr. DeCarlo's expert)
 {¶ 90} Dr. Scanlon was engaged by Mr. DeCarlo. He is a family practitioner who has treated patients who suffer from Alzheimer's and dementia. Dr. Scanlon treated Mary for 20 years. Mary was a nice and intelligent woman. Mary never told him she was abused or presented with any symptoms of abuse. Dr. Scanlon also knew Tony and of the relationship between Mary and Tony. Mary never spoke badly about Tony. There was nothing in Dr. Scanlon's records that indicated that Mary ever had a condition that impaired her decision-making ability or judgment. He opined after a visit with Mary on November 1, 2002, 25 days before her death, that Mary suffered from no mental deficiencies and her cognitive abilities were sound. He could not absolutely opine that Mary was in the same mental condition at death because he did not evaluate her. The only way to determine if a person who might suffer from dementia or Alzheimer's was suffering from symptoms so as to affect their decision-making abilities at any particular moment is to do a clinical evaluation.
 {¶ 91} Dr. Scanlon also saw Mary in May of 2001, July of 2001, January of 2002, August of 2002, and April of 2002. She was mentally competent at each of these times. She did not come to see him for cancer treatment although she did complain of stomach pain during the August 2002 visit. He acknowledged an entry in his records that Mary's symptoms had been getting worse. Dr. Scanlon acknowledged other physicians' entries in Mary's medical records but did not opine to them, although he acknowledged that there was nothing in his records that contradicted these reports.
 {¶ 92} Finally, Dr. Scanlon testified that, among other medications, Mary was taking oxycontin and may have suffered from sedation, nausea or constipation, but he had nothing in his records about these or any other side effects of her medications.
 {¶ 93} Based on the testimony above, we cannot say that the trial court lost its way so as to necessitate a reversal and new trial. The trial court could have reasonably determined based on the testimony above that Mary was not susceptible to influence. Nearly every witness indicated she was a strong-willed person who made all of her own financial decisions until the day she died. Her long time family physician testified that Mary suffered from no mental deficiencies as of November 1, 2002, three weeks before she died. He also testified as to numerous visits with Mary during the year of 2002, when he found that she suffered from no mental deficiencies. While the Estate's medical expert testified as to the typical effects of a cancer diagnosis on a person in general, which effects would make a person susceptible to influence, he did not evaluate Mary and further acknowledged that the nursing home and hospital records did not indicate that Mary had any mental or emotional issues.
 {¶ 94} While evidence was presented that Tony may have kept people from visiting Mary as often as they would have liked, possibly giving him the opportunity to influence Mary, the trial court could have reasonably found that such influence was not in fact exerted or that any influence was reasonable given the facts and circumstances. The trial court could have reasonably found that the ultimate distribution of Mary's assets was as Mary intended pursuant to the legal documents she executed and the testimony presented at trial. Eileen and Marilyn testified that Mary wanted Eileen to have her condominium. Eileen received Mary's condominium. There was no testimony that Mary expressly told anyone that Eileen should have all of her assets or specifically outlined any asset she wanted Eileen to have beyond the condominium. In fact, Marilyn testified that Mary told her Tony was "all set" and Eileen acknowledged that Tony had no other assets, implying that Mary intended to take care of Tony. Both Marilyn and Eileen testified that Tony told them that Mary thought he was greedy because he wanted more than the bank accounts. While this is arguably a self-serving statement, the context in which it was made, supports the interpretation that Tony was upset that he might not be getting the condominium rather than being happy about getting the bank accounts. Moreover, with the additional testimony of Donna Hartman that Mary wanted Tony to have the bank accounts, the trial court could reasonably find that Mary intended Tony to have the bank accounts.
 {¶ 95} Finally, there was no testimony, other than Eileen's opinion, that Mary's signature was forged on the Profit Sharing Plan beneficiary designation form nor was there any specific evidence that Mary did not intend for Tony to be a beneficiary of that particular asset or of the Annuity. In fact, the trial court could have reasonably found that the only evidence as to Mary's intent vis-à-vis the Profit Sharing Plan and/or Annuity and/or bank accounts was that Mary wanted Tony to be the beneficiary of all and took steps to ensure that this happened. That others assisted Mary in accomplishing her goals is not dispositive given her illness and the abundance of evidence that Mary was a strong-willed woman who always did as she wanted to do, especially with regard to financial decisions.
 {¶ 96} We find that the trial court could have reasonably found that Tony did not unduly influence Mary and, thus, the contracts that governed the disposition of Mary's Profit Sharing Plan, Annuity and bank accounts govern. The Estate's third assignment of error is overruled.
 Assignment of Error Four "The existence of a bank signature card containing survivorship language conclusively establishes the survivor's right to the balance of the account, and the lack of a bank signature card containing survivorship language conclusively establishes the estate's right to the balance of the account. The trial court's conclusion to the contrary was clearly erroneous."
 {¶ 97} The Estate asserts that because the signature cards related to Charter One Accounts, containing joint and survivorship language, were not presented at trial, the accounts were not joint and survivorship accounts and the balance of the accounts at the time of Mary's death belongs to the Estate. We disagree.
 {¶ 98} We begin by noting that counsel for Mr. DeCarlo moved to dismiss all claims related to the bank accounts at the close of trial and the trial court granted that motion, finding that the only evidence presented was contrary to the Estate's claims related to these accounts. This decision was entered on the docket on November 23, 2005, as granting Mr. DeCarlo's Civ.R. 41 motion with regard to the bank accounts. The November 23, 2005 entry is missing from the record before us, however, and it cannot be determined if Civ.R. 54(B) language was contained thereon, which would have allowed the Estate immediately to appeal the trial court's dismissal of the bank-related claims prior to the Judgment Entry being rendered. Accordingly, we will consider the Estate's fourth assignment of error as it applies to the findings in the Judgment Entry related to the bank accounts.
 {¶ 99} The trial court found that the bank accounts were a joint and survivorship asset and thus, they were not a part of Mary's estate. The Judgment Entry further finds that Mr. DeCarlo's withdrawals from these accounts during Mary's lifetime, which was an issue raised in the Estate's trial brief, was proper. The Judgment Entry does not address whether or not the bank accounts were joint and survivor accounts vis-à-vis the lack of signature cards. Moreover, there was no testimony at trial from Donna Hartman, the Charter One banker, about the lack of signature cards. She was not asked about the whereabouts of the signature cards. While there is documentary evidence of the nature of the Charter One Accounts that was submitted to the judge, without trial testimony related thereto, that evidence only contains reference to the joint and survivorship nature of the accounts. We acknowledge the difficulty in presenting documentary evidence of something that does not exist (the signature cards); however, the Estate's counsel could have asked Ms. Hartman about the signature cards to establish that they were missing.
 {¶ 100} Absent any evidence that Mary intended the Charter One Accounts to be anything other than joint and survivor accounts, we find that the trial court could have reasonably found such accounts to be joint and survivorship accounts that were not part of the assets of the Estate. The Estate's fourth assignment of error is overruled.
 III. {¶ 101} Each of the Estate's assignments of error is overruled and the judgment of the Summit County Court of Common Pleas, Probate Division, is affirmed.
Judgment Affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
WHITMORE, J., MOORE, J., CONCUR